UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:17-cr-00160-JRS-TAB |
| ELIJAH VINES, | ) ) | -01 |
| Defendants. | ) ) | |

**Order on Defendant Elijah Vines's Motions to Suppress**
**(ECF Nos. 118, 119, 122)**

The Government obtained an indictment charging Defendant Elijah Vines ("Vines") with sex trafficking of a child in violation of 18 U.S.C. § 1591 and related offenses. Vines moves—by three separate filings—to suppress evidence obtained from his iPhone, evidence obtained through various search warrants, and the identification of Vines by Minor Victim One ("MV1"). Those motions are now fully briefed and ripe for decision. The Court entertained arguments from counsel for Vines and for the Government during a status conference held on October 30, 2018. After careful review of the motions, responses, replies, sur-reply, evidence, and relevant law, the Court concludes that Vines's motions should be DENIED for the following reasons.

1

### I. *Motion to Suppress Minor Victim One's Identification of Vines (ECF No. 119)*

Vines moves to suppress MV1's identification of him, contending that MV1's identification was the result of an unduly suggestive identification procedure and so unreliable that its admission into evidence would violate the due process clauses of the Fifth and Fourteenth Amendments. In her first two interviews with law enforcement, MV1 identified one of her traffickers as "Decan Dolla," providing a detailed description of Decan Dolla's appearance, associates, and activities. In her third interview, MV1 informed the investigating officers that Decan Dolla had a second Facebook page, which MV1 would sometimes see when she went through Decan's phone, under the name "Elijah Kilt Vines." (MV1 1/20/17 Intvw. Tr. 26:16-27:4, ECF No. 123-3.) One of the officers pulled up the Facebook page and asked, "Is that him? I can't imagine there's another one with the same name like that." (*Id.* 27:9-11.)

Vines contends that this identification procedure was unduly suggestive. The Supreme Court has prescribed "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). However, the Supreme Court has not "extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers." *Id.* Here, unlike a lineup, photo array, or show-up, the witness first identified the perpetrator by name: "Elijah

Kilt Vines." The investigating officer then pulled up the Facebook page associated with that name. Because MV1's spontaneous identification of Vines by name preceded the investigating officer's purportedly suggestive comment, these are not suggestive circumstances that "police have arranged" to lead "the witness to identify a particular person as the perpetrator of a crime." *Id.* MV1's identification of Vines therefore is not subject to judicial screening of its reliability.

Moreover, even if MV1's identification were the product of suggestive circumstances arranged by police, in light of the totality of the circumstances, MV1's identification retains sufficiently strong indicia of reliability to satisfy due process. To assess the reliability of an identification, courts consider five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

MV1's opportunity to view her trafficker weighs heavily—even overwhelmingly—in favor of the reliability of her identification, as she spent at least several days in close contact with the perpetrator and had the opportunity to observe him in a variety of intimate settings, including in various hotel rooms, in vehicles, and during sexual intercourse. *See id.* at 200 (finding that the victim spent "a considerable period of time with her assailant, up to half an hour").

Furthermore, MV1's description of "Decan Dolla" included not only details of his appearance, but also his various activities and associations, much of which matches or substantially matches Vines. MV1 described Decan Dolla as in his twenties, "brown skinned," and standing five-nine or five-eight—taller than MV1's five-five. Vines was 26 years old at the relevant time, is brown-skinned, and stands five-eleven. MV1 described Decan Dolla's hair as "dreads" and his build as "skinny," "strong," and "buff." Vines wears his hair in dreadlocks and could accurately be described as both "skinny" and "buff." (*See* ECF No. 140-7.) MV1 described Decan Dolla as having a tattoo of "my life, my story" in an arc on his chest. Vines has a tattoo of "my life my struggle" in an arc on his chest. (ECF No. 140-7.)

MV1 stated that Decan Dolla has an infant daughter named "Alia" whose mother is named "Sanjay." Vines has a daughter named Aliyah—an infant at the time— whose mother's name is Sajal. (ECF No. 140-7.) MV1 stated that Decan Dolla drove a red Navigator and a black Impala. (MV1 10/7/2016 Intvw. Tr. 14, ECF No. 123-1.) Vines was arrested driving a red Lincoln Navigator or Aviator (ECF No. 140-5), and his girlfriend told law enforcement that Vines drove to Ohio to pick up MV1 in her black Chevy Sonic (ECF No. 140-7), which resembles an Impala. MV1 stated that Decan Dolla and Kevin Baker were both members of "Kilt Gang." (MV1 10/7/2016 Intvw. Tr. 14, ECF No. 123-1.) In addition to "Kilt" appearing in Vines's Facebook name, Vines's Facebook posts include the hashtags "#kilt," "#kiltgang," "#ForeverKilt," and "#SUPPORTKILTGANG." (ECF No. 140-7.) One of Vines's posts includes a photo of Vines with Kevin Baker and the name "KiltGangKevin." (ECF No.

4

140-7.) MV1 stated that Vines engaged in a phone sales scheme called "quallies." (MV1 10/7/2016 Intvw. Tr. 15–16, 21, ECF No. 123-1.) Vines's girlfriend told law enforcement that Vines makes money "selling phones, also known as 'Bussin Quallies'." (ECF No. 140-7.) MV1 stated that she used the name "Monique Green" when speaking to police. (MV1 11/9/16 Intvw. Tr. 88:9–25.) The police report from Vines's arrest on September 27, 2016, indicates that he was with a "Monique M. Greene," whose identity the arresting officer was unable to confirm. (ECF No. 140-5.) MV1 stated that Decan Dolla and Witness S.P. drove to Ohio to pick up MV1. Witness S.P. told law enforcement that she and Vines drove to Ohio to pick up MV1.

These many details matching Vines overwhelmingly favor the independent reliability of MV1's identification of Vines. *See Biggers*, 409 U.S. at 200 (finding that the victim's description of her assailant, "which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough"). These details, MV1's abundant opportunity to view the perpetrator, and the fact that MV1 has not identified anyone other than Vines as Decan Dolla outweigh the four-month gap between the end of MV1's ordeal and her identification of Vines by name. *See id.* at 201 (finding that a lapse of seven months was outweighed by fact that victim did not identify anyone else as her assailant in the intervening period).

Still, Vines identifies various discrepancies between MV1's description of Decan Dolla and Vines's appearance, for example: whether his dreadlocks are short or long, and blonde-tipped or not; whether his teeth are "a little bit crooked in" or "objectively

5

straight"; whether he has any additional tattoos; and whether he has facial hair. While MV1's descriptions proved to be substantially accurate, they are not "without some flaws, as is most evidence that is properly examined, but these are issues for the jury to decide in weighing any questionable discrepancies." *Lee v. Foster*, 750 F.3d 687, 692 (7th Cir. 2014). Vines's motion is therefore denied.

*II. Motion to Suppress All Evidence Obtained from Vines's iPhone (ECF No. 118)*

In interviews with law enforcement, MV1 alleged that Vines used his cell phone to record her performing oral sex on him. (Cuevas Aff. ¶ 8, ECF No. 118-1; MV1 11/9/16 Intvw. Tr. 19:3-6, ECF No. 123-2.) MV1 also alleged that Vines used his iPhone to photograph her and to share the photos with potential clients through a website and a messaging application. (MV1 11/9/16 Intvw. Tr. 20:8-21:3, ECF No. 123-2.)

Vines gave his iPhone to his girlfriend, Sajal Smoote ("Smoote"), when he was taken into federal custody on July 14, 2017. (Cuevas Aff. ¶ 9, ECF No. 118-1; Smoote Intvw. 3, ECF No. 141-1.) Smoote did not know the password to Vines's iPhone, but she kept the phone at her home until mid-August 2017, when she provided it to law enforcement. (Cuevas Aff. ¶ 9, ECF No. 118-1; Smoote Intvw. 3, ECF No. 141-1.) The Government subsequently obtained a warrant to search Vines's iPhone.

Vines argues that all evidence obtained from his iPhone should be suppressed because law enforcement's seizure of the phone from Smoote violated the Fourth Amendment. The Fourth Amendment protects the "right of the people to be secure

6

in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In general, "seizure of personal property [is] *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant . . . ." *United States v. Place*, 462 U.S. 696, 701 (1983). No warrant is required, however, where the government seizes a defendant's property by "consent legitimately obtained from a third party." *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009). "[W]here a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *Id.* at 713–14.

In analyzing third-party consent to a search or seizure of a closed container or digital device, *see United States v. Wright*, 838 F.3d 880, 885 (7th Cir. 2016) ("in this context computers are akin to closed containers"), the Seventh Circuit distinguishes between authority to consent to a *seizure* of the object and authority to consent to a *search* of its contents. *See, e.g.*, *United States v. Basinski*, 226 F.3d 829, 835 (7th Cir. 2000) (affirming suppression of the contents of a briefcase where the consenting party had possession of the locked briefcase but did not have access to its contents); *James*, 571 F.3d at 714.

In *James*, the defendant lived in his mother's house until he rented an apartment. 571 F.3d at 710–11. Two months later, he was arrested for bank robbery and incarcerated pending trial. *Id.* at 711. During his pretrial detention, the defendant's lease expired, and his mother gathered his possessions from the apartment and brought

7

them back to her house. *Id.* at 714. The defendant told his mother that his safe at her house contained a gun, and the defendant's mother subsequently contacted law enforcement and consented to seizure of the safe. *Id.* at 715. The Seventh Circuit held that the defendant's mother had actual authority to consent to the seizure. *Id.* at 714. In *Wright*, the defendant's girlfriend consented to a warrantless search of the defendant's computer. 838 F.3d at 883. The Seventh Circuit reasoned that the girlfriend had authority to consent to the search because she and her children accessed the computer freely. *Id.*

Vines argues that the crucial difference between *Wright* and this case is that the computer in *Wright* was not password protected. (ECF No. 118 at 4.) "Like a lock on a briefcase or storage trunk, password protection on a computer demonstrates the owner's affirmative intent to limit access to its contents." *Wright*, 838 F.3d at 886. But Vines ignores another critical difference: at issue in *Wright* was consent to a warrantless search of the contents of the computer. Even though Smoote did not have access to the iPhone's password-protected contents, she exercised control over the iPhone itself, just as in *James* the defendant's mother controlled the locked safe. Thus, even if Smoote lacked authority to consent to a search of the iPhone's contents, she had authority to consent to the iPhone's seizure.

The subsequent search of the iPhone's contents was conducted pursuant to a warrant. Vines contends that the application for that warrant did not disclose that Smoote did not have the password to Vines's iPhone. Not only is it common and commonly known that phones are password protected, but even if the judge had not

8

considered that possibility or contrarily assumed that this particular phone was not password protected, the seizure was valid regardless of the password (as discussed above), and the warrant was sought and granted for the very purpose of searching the phone's contents. Vines's motion to suppress the evidence obtained from his iPhone is therefore denied.

*III. Motion to Suppress Search Warrants (ECF No. 122)*

Vines moves to suppress all evidence obtained through search warrants executed on Vines's iCloud and Facebook accounts, as well as the Facebook accounts of three other individuals. (ECF No. 122 at 1.) Vines principally contends that the affidavits submitted to obtain the search warrants were materially false because they omitted various inconsistencies in MV1's statements to investigators, and that the omissions were intentional or reckless. (*Id.* at 18–28.)

As a preliminary matter, Vines lacks standing to challenge the search warrants executed on the other individuals' Facebook accounts, as he does not have a legitimate expectation of privacy in someone else's Facebook account. This is so even if, as Vines contends, he had a subjective expectation of privacy in the private messages he sent to those accounts, as "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979). While the inquiry should end here, the Court notes and rejects Vine's contention that this is really not a standing issue, but a fruit-of-the-poisonous-tree issue in

9

that the search warrant applications for Baker's, Meeks's, and Witness S.P.'s accounts incorporated evidence gleaned from the search warrants executed on Vines's accounts. Putting aside the fatal threshold finding of no standing, Vine's contention fails at least due to the countervailing doctrine of inevitable discovery. Indeed, IMPD had Vines's and Baker's Facebook accounts preserved in the course of its investigation before submitting any warrant application. (ECF No. 122-1 at 14.) The government routinely checks social media in sex trafficking cases, and here the reported intimidation of Witness S.P. over Facebook in July 2017, Baker's and Vines's posts about their case, and Baker's and Vines's discussions of their accounts in jail calls would have provided grounds for a search warrant.

As for the search warrants that Vines does have standing to challenge, in order to be entitled to an evidentiary hearing, Vines must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). "*Franks* also applies to deliberately or recklessly deceptive omissions," in which case the defendant must show that if the purported omissions were included in the warrant application, probable cause would have been absent. *United States v. McMurtrey*, 704 F.3d 502, 508–09 (7th Cir. 2013).

Here, Vines contends that the omission of information relating to MV1's credibility—namely, that certain of MV1's statements were inconsistent or uncorroborated—was necessary to the finding of probable cause. The Seventh Circuit has held that

probable cause is absent where the affidavit in support of a search warrant relies on an informant, lacks detail, and completely omits information bearing negatively on the informant's credibility. *See, e.g. United States v. Glover*, 755 F.3d 811 (7th Cir. 2014); *United States v. Peck*, 317 F.3d 754 (7th Cir. 2003). However, "[f]or purposes of the probable cause inquiry, [the Seventh Circuit] has generally drawn a distinction between anonymous tips, on the one hand, and information provided by an eyewitness or victim to a crime," affording victims and eyewitnesses a presumption of credibility not afforded other informants. *United States v. Geasland*, 694 F. App'x 422, 431–32 (7th Cir. 2017) (collecting cases), *cert. denied* 138 S. Ct. 699 (2018).

Unlike *Glover* and *Peck*, here the affidavits are based on statements of an alleged victim, not an informant; moreover, as submitted, the affidavits are detailed and include extensive information corroborating MV1's statements. Investigators corroborated through Backpage that there were, consistent with MV1's statements, postings to Backpage advertising MV1 under the names "Halle" and "Violet." (*Id.* at 9, 11.) MV1's involvement in prostitution with Vines was corroborated by Witness S.P.'s statement, which was itself corroborated by the police report resulting from Witness S.P.'s call to police. (*Id.* at 10.) Other aspects of MV1's statements and Witness S.P.'s statement were corroborated by the registries of hotels that MV1 and Witness S.P. specifically mentioned. (*Id.* at 10–11.) MV1's statements about A.D., including that MV1 and A.D. were advertised on Backpage for "two girl specials," were corroborated by A.D.'s statement. (*Id.* at 12.) Baker's involvement with MV1 and A.D. was corroborated by the circumstances of A.D.'s and Baker's arrests as well as by Witness

11

S.P.'s statement. (*Id.* at 10–12.) Given the affidavits' level of detail and corroboration, there would have been probable cause for search of Vines's Facebook and iCloud accounts even if the alleged omissions had been fully disclosed in the warrant applications.

In addition to the alleged omissions relating to MV1's credibility, Vines complains that the warrant application's information was recycled multiple times and a beefed-up application to a second judge failed to indicate that a warrant was initially denied by a first judge before the beefed-up application was submitted to the second judge, who ultimately issued the warrant. The Court finds nothing nefarious or improper in the economy realized by cut-and-pasting relevant information from one document to another. As for the failure to indicate on the application that the affidavit had previously been submitted and denied, the second affidavit was, in fact, different (*i.e.*, beefed-up) from the first (and thus had not been "submitted before to another judge"). Moreover, given the level of detail and corroboration discussed above, probable cause existed regardless of what was, at most, clerical oversight.

Vines's motion to suppress evidence obtained through the search warrants is therefore denied.

## IV. Conclusion

For the foregoing reasons, Vines's Motion to Suppress All Evidence Obtained from Vines's iPhone (ECF No. 118), Motion to Suppress GMC's Identification of Vines (ECF No. 119), and Motion to Suppress Search Warrants (ECF No. 122) are all **DENIED**.

**IT IS SO ORDERED.**

Date: 10/31/2018

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kristina M. Korobov
UNITED STATES ATTORNEY'S OFFICE
kristina.korobov@usdoj.gov

Bradley Paul Shepard
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brad.shepard@usdoj.gov

Julie L. Treida
TREIDA LAW
treidalaw@gmail.com